## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) ProDigital Labs, LLC, an Oklahoma limited liability company, | |
| Plaintiff, | |
| v. | Case No. _____CIV-23-101-J_____ |
| (1) Straight Smile, LLC d/b/a Byte, a Delaware limited liability company, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Plaintiff, Pro Digital Labs, LLC ("ProDigital"), for its claim against Defendant, Straight Smile, LLC d/b/a Byte ("Byte"), respectfully shows the Court as follows:

## PARTIES

1.     ProDigital is an Oklahoma limited liability company with its principal place of business in Ardmore, Oklahoma.

2.     ProDigital's members are each a citizen of the State of Oklahoma and the State of California, and ProDigital is therefore a citizen of the State of Oklahoma and the State of California for purposes of diversity jurisdiction.

3.     Byte is a Delaware limited liability company.

4.     On information and belief, the sole member of Byte is Dentsply.

5.     Dentsply is a Delaware corporation with is principal place of business in Charlotte, North Carolina.

6.    Dentsply and, therefore, Byte are each a citizen of the State of Delaware and the State of North Carolina for purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as this is an action between citizens of different states and the amount in controversy is well over $75,000.

8.    This Court has personal jurisdiction over the parties by their consent in the agreement underlying this action. Moreover, Defendants purposefully directed their activities at Oklahoma, some of which form the basis of this action.

9.    Venue is proper in this district pursuant to the parties' agreement underlying this action. Additionally, venue is appropriate in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events and/or omissions giving rise to the claims occurred herein.

## FACTUAL ALLEGATIONS

### A.  The Parties' Preliminary Negotiations and Provision of Services

10.    ProDigital was formed in 2018 for the purpose of manufacturing clear dental aligners and other dental products. ProDigital also provides related services, including high-resolution scanning of dental impressions used to create aligners.

11.    Byte is a direct-to-consumer, doctor-directed clear aligner company. Byte's clear aligner system provides customers access to at-home "invisible" aligners for a straighter and/or whiter smile.

12.    Byte sends prospective customers an "impression kit" that includes instructions, items necessary to make four molds of the prospective customer's teeth (two

2

molds of the upper teeth and two molds of the lower teeth), and prepaid shipping for return of the impression kit upon completion.

13.    Upon return of the impression kits, each mold must be scanned and uploaded (collectively referred to as "scanning services"). Byte evaluates the scans to determine if the prospective customer is a "good candidate" for the requested type of aligner, and, if so, Byte makes certain alterations and uploads the prospective customer's "digital case file" to Byte's system. If the customer elects to purchase, the customer's digital case file is sent to Byte's manufacturer for production of the final product (*i.e.*, the requested aligner(s)). The product is then shipped from the manufacturer to the customer.

14.    In late 2019, Byte approached ProDigital about providing the scanning services and manufacturing for Byte's clear aligner system.

15.    Byte was interested in partnering with ProDigital because ProDigital could provide value beyond scanning services, as a result of ProDigital's unique insight, know-how, strategy, and customer and sourcing information that could further Byte's goals and profitability.

16.    To induce ProDigital to perform the requested scanning and manufacturing services, Byte provided ProDigital with projected forecasts of Byte's expected requirements for scanning services, products, and manufacturing during the last quarter of 2019.

17.    Byte also made oral and written representations to ProDigital that Byte would exclusively use ProDigital for Byte's scanning services. However, Byte—with respect to the manufacturing side—represented that it needed multiple sources for manufacturing.

18.     Based on Byte's representations and forecasts, the parties began negotiating written agreements for the requested scanning and manufacturing services in January 2020.

19.     On or around February 14, 2020, and prior to execution of a final written agreement between the parties, Byte caused impression kits to be shipped to ProDigital for the scanning services.

20.     By email dated March 2, 2020, Byte further represented to ProDigital that it would gradually increase the amount of impression kits shipped to ProDigital each week until March 23, 2020, at which point it would send "all" impression kits to ProDigital. Thus, ProDigital anticipated that by March 23, 2020, it would perform all scanning services on behalf of Byte.

21.     In reasonable reliance on Byte's representations concerning its demand for scanning services and ProDigital's exclusive performance thereof, ProDigital purchased hundreds of thousands of dollars' worth of scanning equipment. Additionally, ProDigital hired a large number of around-the-clock workers.

22.     Byte continued to send impression kits to ProDigital during March 2020.

**B.  *The Services Agreement and Statement of Work***

23.     Effective March 31, 2020, ProDigital and Byte entered into a written Services Agreement (the "Services Agreement"), *Ex. 1, Services Agreement*, under which Byte retained ProDigital, as Contractor, to provide certain services and/or to develop products relating to the scanning services described above. *Id.* at §§ 1-2.

24.     In connection with and as provided in the Services Agreement, ProDigital and Byte also entered into Statement of Work No. 1 (the "SOW"), *Ex. 2, SOW*,[1] under which ProDigital agreed, upon **receipt** of impression kits from Byte's customers, to evaluate each of the impressions, choose the "best" upper and lower impressions, scan the two best impressions, upload the images to Byte's system, and delete such images thirty days after uploading them (*i.e.*, scanning services). *Ex. 1, Services Agreement* at § 3.1; *Ex. 2, SOW* at § 2.

25.     The SOW provides that ProDigital would be compensated at a rate of $1.00 to compare impressions and select the best two impressions for scanning and $9.00 per impression scanned and uploaded to Byte's system. *Ex. 2, SOW* at § 3(a).

26.     The Services Agreement expressly grants ProDigital the right to provide professional services and products to entities other than Byte. *Id.* at § 2.

27.     By contrast—and consistent with the parties' prior discussions and Byte's oral and written representations that it would send "all" impression kits to ProDigital for scanning—the Services Agreement does not grant Byte a similar right of non-exclusivity. To the contrary, the Services Agreement contemplates that Byte would "fulfill[ ] its obligations for minimum orders under th[e] [Services] Agreement." *Id.* at § 2.

28.     Consistent with the parties' prior understanding, the Services Agreement is a requirements contract, and, accordingly, it does not specify a quantity.

---

[1]     Unless specified otherwise, reference to the "Services Agreement" shall include both the Services Agreement and the SOW. Where applicable, citation to one or both instruments will be made.

29.    ProDigital agreed to complete the scanning services with respect to each impression kit by 5:00 PM of the business day following *receipt* of each impression kit from Byte's customer, *Ex. 2, SOW* at § 4(a), provided that Byte timely complied with its contractual obligations, *Ex. 1, Services Agreement* at § 5.4.

30.    One such obligation was that Byte, each quarter, "provide [ProDigital] with an average daily forecast of impression kits to be scanned." *Ex. 2, SOW* at § 4(a).

31.    Additionally, ProDigital was not responsible for delays "related to the local postal facility distribution[,]" *id.*, or delays or failures that are the direct result of causes outside ProDigital's control (*i.e.*, a Force Majeure Event), *id.* at § 4(c). Specifically, the parties' "Minimum Purchase Obligation or Service Levels are suspended for so long as the Force Majeure Event continues and such party uses best efforts to resume performance of its obligations as soon as practically possible." *Id.* at § 4(c); *see also Ex. 1, Services Agreement* at § 12.4 (agreeing that neither party is responsible or liable for delay or failure resulting from a "Force Majeure Event"; "provided that such party uses best efforts to resume performance of its obligations as soon as practically possible.").

32.    The term of the Services Agreement is from the effective date (*i.e.*, March 31, 2020) (the "Effective Date") until it is terminated in accordance with its provisions. *Ex. 1, Services Agreement* at § 8.1. The Services Agreement provides for termination only upon (A) failure to cure a material breach of the Services Agreement within thirty days of receipt of written notice of said breach from the non-breaching party or (B) without cause or reason, upon six months prior written notice to the other party. *Id.* at § 8.2.

33.     The "Deliverables" and the time frames associated with them—as defined by the Services Agreement and described in the SOW—may be revised *if* the parties reach an agreement on the new fees, time frames, or Deliverables. *Id.* at § 3.2. If no such agreement is reached, "they shall continue under the terms of the original applicable SOW." *Id.*; *see also id.* at § 12.1 ("This [Services] Agreement may not be modified except by writing signed by both parties.").

34.     Additionally, the Services Agreement permits Byte to assign all or a portion of its rights and responsibilities thereunder "to any affiliate or to any entity that succeeds to or acquires all or substantially of the business of Byte . . . [,]" and the "[Services] Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and assigns." *Id.* at § 12.8.

## C.  *The Manufacture Agreement and Amendments Thereto*

35.     Effective March 31, 2020, the parties also entered into a Manufacture and Supply Agreement ("Manufacture Agreement"), *Ex. 3, Manufacture Agreement*, under which Byte retained ProDigital, as Manufacturer, and agreed to make a "good-faith effort to order no less than two-thirds of its Products [i.e., clear visible aligner trays and certain other products] from [ProDigital]," *id.* at § 3.1.

36.     Like the Services, Agreement, "[ProDigital] is free to provide services and Products to other entities." *Id.* at § 2. **Unlike** the Services Agreement, the Manufacture Agreement expressly provides that Byte may acquire its Products from other suppliers. *Id.* at § 2 ("[ProDigital] shall be a non-exclusive supplier of the Products to Byte.").

37.    The Manufacture Agreement provides that it could be terminated by either party upon 180 days' written notice. *Id.* at § 11.2.

38.    After execution of the Management Agreement, ProDigital began manufacturing a variety of products for Byte.

39.    Over time, however, a dispute between the parties arose over Byte's reduction in orders and consistent failures to provide accurate forecasts for orders.

40.    The parties twice amended the Manufacture Agreement, with the most recent being a Second Amendment to Manufacture Agreement dated effective April 1, 2022 (the "Second Amendment"). *Ex. 4, Second Amendment.*

41.    The Second Amendment recites that it amends the Manufacture and Supply Agreement (*i.e.*, the Manufacture Agreement), as amended by the First Amendment to such agreement. *Id.* at 1. In accordance with the Manufacture Agreement, the Second Amendment defines ProDigital as "Manufacturer." *Id.*

42.    The Second Amendment provides for an orderly wind-down of the parties obligations under the Manufacture Agreement, with the Manufacture Agreement to terminate on December 31, 2022.

43.    The Second Amendment also addresses the various claims that had arisen between the parties relating to the Manufacture Agreement and provides for a waiver and release of ProDigital's claims against Byte. Specifically, the Second Amendment provides that ProDigital:

> [R]eleases and discharges Byte . . . from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of

action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses (including attorneys' fees and costs actually incurred), and punitive damages, of any nature whatsoever, known or unknown (collectively "Losses") which **Manufacturer** has, may have, or may have had, against Byte or its Related Entities, whether or not apparent or yet to be discovered, or which may hereafter develop, ***for any acts or omissions related to or arising from Byte's actual or alleged failure to comply with its obligations under the Agreement prior to the date of this Amendment***, including without limitations any obligations related to any Minimum Purchase Obligation under the Agreement prior to the date of this Amendment.

*Id.* at § 7 (emphasis added).

44.    Nothing in the Second Amendment mentions the Services Agreement or the parties' rights and obligations thereunder.

### D. The Parties' Course of Dealing Under the Services Agreement

45.    In the weeks leading up to and following execution of the Services Agreement, the COVID-19 pandemic began to widely affect various aspects of the global workforce, resulting in significant operational complications associated with employee safety and inability to work due to sickness. Specifically, the COVID-19 pandemic caused unconventional procedures relating to the way deliveries were completed (or not completed) and resulted in unprecedented delivery delays by the United States Postal Services and other delivery companies across the entire nation.

46.    Also, Byte's procedure in which ProDigital received (or did not receive) impression kits from Byte's customers was flawed from the jump—issues that were only exacerbated by the COVID-19 pandemic. Such "procedure" included Byte's outright

refusal to provide ProDigital with information necessary to determine the number of impression kits "delivered."

47.    For example, Byte would claim that ProDigital received a certain number of impression kits—but would refuse to provide a comprehensive record of such shipments—and claim that ProDigital either "lost" the shipped items or was behind in performing the scanning services. In connection therewith, Byte would show receipt(s) that claimed items were "delivered"; however, such receipt(s) clearly identified that (A) items were "delivered" to (and left at) the post office or (B) an address different from ProDigital's. Without adequate records, ProDigital was wholly unaware of such shipments.

48.    As a result, ProDigital's receipt of impression kits from Byte's customers was negatively impacted. Whenever ProDigital mentioned the fluctuating numbers to Byte, Byte assured ProDigital that some days (such as Tuesdays) were slow due to USPS delivery schedules and that Byte was following the previously mentioned schedule (wherein receipt of impression kits gradually increased to "all").

49.    Despite these issues, ProDigital continued to provide scanning services to Byte in accordance with the Services Agreement and continued to seek and propose solutions to such delivery issues. Additionally, ProDigital repeatedly informed Byte that it was willing and able to perform the scanning services in accordance with the Services Agreement.

50.    During the first year of the COVID-19 pandemic, ProDigital implemented various procedures to promote workplace safety. In addition to seeking a safer environment

for ProDigital's employees, these procedures ensured that ProDigital could remain operating and continue meeting Byte's demand.

51.     With these two goals in mind, ProDigital: (A) mobilized its employees and necessary equipment to multiple facilities so that its employees could practice social distancing; (B) manufactured its own personal protective equipment ("PPE") at a time when the cost and demand for PPE skyrocketed; and (C) sterilized impression kits upon receipt. While this decreased the spread and the likelihood that employees would be absent due to sickness, this necessitated additional expenses and time of ProDigital.

52.     Byte recognized the benefit of such procedures and commended ProDigital for them (*e.g.*, "Good you broke the team apart to protect against this issue").

53.     Aside from issues directly relating to the COVID-19 pandemic and Byte's inadequate delivery procedures, Byte also failed to provide ProDigital with quarterly average daily forecasts, as required by the Services Agreement.

54.     As a result, ProDigital was unable to accurately anticipate the volume of impression kits it would receive from Byte's customers on a given day.

55.     For example, ProDigital once received approximately 415 impression kits (total) in an entire week. The following week, ProDigital received 470+ impression kits in a single day. As another example, some days ProDigital received as few as 12 impression kits; on other days, the volume would exceed 825 impression kits.

56.     ProDigital repeatedly emphasized to Byte the importance of having accurate daily estimates so that it could have appropriate staffing levels to handle Byte's volume, pointing to the wildly fluctuating volumes.

57.    Due to a combination of these issues beyond ProDigital's control (A) ProDigital was forced to send employees home due to receipt of a low quantity of impression kits (*i.e.*, no work for them to perform) or (B) ProDigital was forced to request that its employees work double shifts and/or on weekends so that Byte's demand could be met.

58.    Although largely due to the COVID-19 pandemic and to Byte's *own* failures, Byte occasionally complained about timeliness of scans and questioned ProDigital's ability to meet Byte's demand. Nonetheless, Byte never notified ProDigital in writing of any material breach of the Services Agreement (per the Services Agreement).

59.    However, in mid-2022, the parties' relationship began to deteriorate—largely related to issues under the Manufacturing Agreement.

60.    Although the parties agreed in the April 2022 Second Amendment to an orderly wind down of their obligations under the Manufacturing Agreement and release of claims, there was no similar agreement with respect to the Services Agreement.

61.    Nevertheless, Byte began significantly reducing the number of impression kits it was sending to ProDigital under the Services Agreement. Further, in or around third quarter 2022, Byte (for the first time) took the position that the Services Agreement contained no minimum volume obligations and that it was not obligated to send any impression kits to ProDigital for scanning.

62.    Byte's new position is contrary to the parties' understanding and prior representations and to the terms of the Service Agreement.

63.     Additionally, Byte has indicated that it believes that any claim ProDigital has against it relating to the Services Agreement has been waived under the Second Amendment—even though that document plainly only releases claims arising out of the Manufacture Agreement.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

Each of the foregoing allegations are adopted and incorporated as if fully restated herein.

64.     Byte and ProDigital entered into a valid contract through the Services Agreement.

65.     The Services Agreement specifies that ProDigital would perform specific services for Byte.

66.     The Services Agreement provides that impression kits would be sent to ProDigital from Byte's customers. ***Upon receipt***, ProDigital agreed to evaluate and select the best upper and lower impressions and then scan those impressions and upload them to Byte's system, for which ProDigital would be compensated at a rate of $1 to compare impressions and $9 for each uploaded scan of an impression. *Ex. 2, SOW at §§ 2, 3*

67.     The Services Agreement has no fixed quantity of services. Instead, it is a requirements contract, obligating Byte to send all of its impression kits to ProDigital for scanning services. *See Ex. 1, Services Agreement at § 2; Ex. 2, SOW at §§ 2, 3.*

68.     The Services Agreement obligates Byte to supply ProDigital (A) all information and materials necessary for ProDigital to perform the scanning services, *Ex. 1,*

*Services Agreement* at 3.1(f), and (B) an average daily forecast of impression kits to be scanned, on at least a quarterly basis, *Ex. 2, SOW* at § 4(a).

69.    It specifically provides that "[ProDigital] will not be responsible for delays related to the local postal facility distribution." *Id.* Moreover, "the Minimum Purchase Obligation or Service Levels are suspended for so long as [a] Force Majeure Event continues and such [affected] party uses best efforts to resume performance of its obligations as soon a practically possible." *Id.* at § 4(c); *see also Ex. 1, Services Agreement* at § 12.4.

70.    The Services Agreement allows Byte to "assign all or portion of its rights and responsibilities under this [Services] Agreement to . . . any entity that succeeds to or acquires all or substantially all of the business of Byte through merger, consolidation, acquisition of stock or assets, or other business combination." *Ex. 1, Services Agreement* at § 12.8. And "[t]his [Services] Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and assigns." *Id.*

71.    With respect to term, the Services Agreement was to remain in effect until (A) terminated by either party for cause if the other party commits a material breach of the Services Agreement and fails to cure such breach within thirty days of its receipt of written notice of the breach from the non-breaching party, OR (B) without cause or reason upon six months' prior written notice to the other party. *Id.* at §§ 8.1, 8.2.

72.    Byte has not given written notice of any material breach or written notice of termination without cause. Moreover, the parties have not amended or otherwise altered their rights or obligations under the Services Agreement. Consequently, the Services

Agreement (including the SOW) therefore remains in full force and effect, and the parties "shall continue under the terms of the original applicable SOW." *See id.* at §§ 3.2, 8.1, 8.2, 12.1.

73.    Byte breached and is continuing to breach the Services Agreement by at least the following acts and/or omissions:

    i.    Failing and refusing to provide ProDigital the average daily forecast of impression kits to be scanned and the information and materials necessary for ProDigital to perform the scanning services;

    ii.    Failing and refusing to send to ProDigital the entirety of Byte's required scanning services work;

    iii.    Attempting to hold ProDigital responsible for Byte's flawed delivery procedure;

    iv.    Attempting to hold ProDigital responsible for issues relating to local postal facility distribution;

    v.    Failing and refusing to resume Byte's obligations after the Force Majeure Event (*i.e.*, the COVID-19 pandemic no longer precluded (in whole or in part) Byte's performance and/or ProDigital's performance under the Services Agreement;

    vi.    By not demanding Dentsply to act in accordance with § 12.8 of the Services Agreement upon its acquisition of Byte on or around December 31, 2020; and

vii.    By attempting to terminate the Services Agreement in a manner contrary to the terms of the Services Agreement.

74.    As a result of Byte's breaches, ProDigital has suffered monetary damages in an amount to be determined at trial, but in excess of $75,000.

## SECOND CAUSE OF ACTION
### Breach of the Implied Duty of Good Faith and Fair Dealing

Each of the foregoing allegations is adopted and incorporated as if fully restated herein.

75.    Byte and ProDigital entered into a valid contract through the Services Agreement.

76.    There is implied in every contract a duty of good faith and fair dealing.

77.    The duty of good faith and fair dealing imposes on Byte an obligation to refrain from any act that injures ProDigital's reasonable expectation and/or that impairs ProDigital's right to receive the benefits under the Services Agreement.

78.    Byte breached this duty by, among other things:

i.    Refusing and failing to provide ProDigital with the average daily forecasts / estimates of Byte's demand for scanning services;

ii.    Refusing and failing to provide ProDigital with information needed to ensure that shipments of impression kits were timely received and accounted for;

iii.    Failing to implement a solution to issues Byte caused that prevented ProDigital's performance under the Services Agreement (*e.g.*,

procedure in which ProDigital received impression kits from Byte's customers);

iv.   Asserting that Byte was following the delivery schedule and assuring ProDigital that any dip in quantity was due to USPS delivery schedules (*i.e.*, that certain days quantity was lower because of USPS delivery schedules from customers to ProDigital);

v.    Flooding ProDigital with a massive number of impression kits in a single day after delivering a small number the entire previous week;

vi.   By claiming that Byte had/has no obligation to allow ProDigital to perform *any* scanning services; and

vii.  Disingenuously asserting that Byte needed to rely on other contractors because ProDigital was unable to accommodate Byte's requirements when ProDigital consistently asserted that ProDigital could handle Byte's requirements so long as Byte provided average daily forecasts and delivered information (*i.e.*, Byte act in accordance with the terms of the Services Agreement).

79.   Byte's breaches have had the effect of hindering and impeding ProDigital's ability to perform under the Services Agreement and has prevented ProDigital from receiving the benefit of its contract with Byte.

80.   By reason of the foregoing, ProDigital is entitled to monetary damages in an amount to be determined at trial, but in excess of $75,000.

## THIRD CAUSE OF ACTION
### Declaratory Judgment

Each of the foregoing allegations is adopted and incorporated as if fully restated herein.

81.    An actual controversy now exists between ProDigital and Byte concerning their rights and duties under the Second Amendment.

82.    Byte contends that the Manufacturing Agreement's Second Amendment (*Ex. 4, Second Amendment*) governs and/or otherwise alters the parties' rights and obligations under the Services Agreement.

83.    ProDigital asserts that the Manufacturing Agreement's Second Amendment—to the extent that it is enforceable at all—relates only to the parties' rights and obligations under the Manufacturing Agreement and the First Amendment thereto.

84.    Based on the terms of and the parties' conduct relating to the Second Amendment, ProDigital is entitled to a judicial determination that:

i.    To the extent that the Second Amendment is enforceable, it does not alter the parties' rights and/or obligations in connection with the Services Agreement; and

ii.    To the extent that the Second Amendment is enforceable, it does not release any claim or right of ProDigital in connection with the Services Agreement.

## THIRD CAUSE OF ACTION
**Promissory Estoppel**

Each of the foregoing allegations is adopted and incorporated as if fully restated herein.

85.    In the last quarter of 2019, Byte sent ProDigital forecasts of demand in connection with the parties' discussions about ProDigital's ability and willingness to fulfill Byte's scanning services needs.

86.    Byte subsequently clearly and unambiguously promised ProDigital that it would send "all" its impression kits to ProDigital by March 23, 2020, and thereafter.

87.    In reliance on Byte's forecasts and promises to send ProDigital "all" impression kits, ProDigital purchased approximately $425,000 in CT scanning equipment and system upgrades and drastically increased its workforce to handle Byte's anticipated round-the-clock scanning services needs.

88.    At the time Byte made its promises to send "all" impression kits to ProDigital, it was reasonably foreseeable to Byte that ProDigital would necessarily incur significant capital expenditures to meet Byte's supposed demand—as evidenced, in part, by Byte's unwillingness to perform such scanning services (itself) at the time it made such promises. Also, due to the lucrative business relationship of the parties, it was reasonably foreseeable to Byte that ProDigital would expend considerable sums of money to perform the promised scanning services.

89.    However, contrary to its promises, Byte did not send "all" its impression kits to ProDigital for scanning. In fact, it sent only a fraction and then ultimately ceased sending any impression kits.

90.    During the first quarter of 2020 and the beginning of the COVID-19 pandemic, Byte sought assurances from ProDigital that it could meet Byte's demand in spite of the COVID-19 pandemic and its related issues and mentioned that it could "reroute temporarily" the impression kits to another company that could provide the scanning services. In response, ProDigital stated that it was ready and willing to perform the scanning services in accordance with Byte's promises. ProDigital reiterated on multiple separate occasions that it purchased hundreds of thousands of dollars' worth of equipment for the specific purpose of fulfilling Byte's needs.

91.    As a result, ProDigital suffered significant losses associated with excess employees and specialized scanning equipment that it had purchased specifically for Byte's anticipated scanning needs.

92.    Hardship can be avoided only by enforcement of Byte's promise to send "all" impression kits to ProDigital.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, ProDigital Labs, LLC, prays for judgment in its favor and against the Defendant, Straight Smile LLC d/b/a Byte, on each of ProDigital's claims and award damages, reformation, and/or such other and further relief as the Court deems just and proper.

Respectfully submitted,


/s/ *Mark R. McPhail*

Len B. Cason OBA #1553
Mark R. McPhail OBA #15307
Taylor Kaye Weder OBA #34045
HARTZOG CONGER CASON LLP
201 Robert S. Kerr Avenue, Suite 1600
Oklahoma City, OK 73102
Telephone: (405) 235-7000
Fax: (405) 996-3403
lcason@hartzoglaw.com
mmcphail@hartzoglaw.com
tweder@hartzoglaw.com

***and***

Justin R. Landgraf OBA#22204
REPUBLIC LAW GROUP
7 East Main Street
Ardmore, Oklahoma 73401
Phone: (580) 226-6277
justin@republiclawgroup.com

**ATTORNEYS FOR PLAINTIFF
PRODIGITAL LABS, LLC**